NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 20-01064 (SRC) |
| v. | |
| JUSTIN RODRIGUEZ | **OPINION & ORDER** |

**CHESLER**, District Judge

This matter comes before the Court upon the omnibus pretrial motion filed by Defendant Justin Rodriguez ("Rodriguez" or "Defendant"). (ECF No. 60). The United States of America ("the Government") responded to the omnibus application, (ECF No. 61), and Defendant replied to the Government's response, (ECF No. 62). The Court rules on the various motions contained in Defendant's omnibus application as follows.

**I.    BACKGROUND**

Defendant has been charged with possession of a firearm and ammunition by a convicted felon, possession with intent to distribute cocaine, and possession of a firearm and ammunition in furtherance of a drug trafficking crime. (ECF No. 31). As alleged in the police reports submitted in conjunction with this motion, these charges arose from the following facts.[1]

On July 2, 2020, seven officers with the Essex County Sheriff's Office were conducting a narcotics investigation in the area of Boyd Street and West Kinney Street in Newark, New Jersey. (ECF No. 60, Def. Br., Exhibit A, PageID# 241) [hereinafter "Incident Report"]. One of the officers, Detective Sergeant Christopher Bozios ("Bozios") observed approximately four or

---

[1] To the extent Defendant challenges the version of events reported by the police, the Court will address his arguments in the Discussion section of this Opinion & Order.

1

five individuals enter a white BMW sedan. Incident Report, PageID# 241. The car began to pull away but then immediately pulled back towards the curb. Incident Report, PageID# 241. The individuals then exited the vehicle and began to "disperse in different directions." Incident Report, PageID# 241. Around this time, Bozios also observed a black Audi A3 pull up next to the white BMW.[2] Incident Report, PageID# 242. He saw a Hispanic male, later identified as Rodriguez,[3] walk to the rear of the white BMW, remove what Bozios believed was a handgun, walk back to the black Audi, and place the object on the front passenger side floorboard of the Audi. Incident Report, PageID# 242. Seconds later, Bozios observed Rodriguez move the object from the front floorboard to the back seat of the Audi. Incident Report, PageID# 242. Rodriguez then drove away in the Audi, traveling eastbound on West Kinney Street. Incident Report, PageID# 242. At this time, Bozios made the decision to surveil the vehicle, rather than pull it over, because there were no "police vehicles on scene that were equipped with lights an[d] sirens." Incident Report, PageID# 242.

Law enforcement agents followed the Audi until it came to a stop in front of an apartment building at 475 N. 12th Street in Newark, approximately fifteen minutes away from the corner of Boyd and West Kinney Street. Incident Report, PageID# 242. Rodriguez then exited the vehicle and walked toward the building. Incident Report, PageID# 242. The officers approached the building and announced themselves as Rodriguez entered it. Incident Report, PageID# 242. Rodriguez closed the door as he entered, and it locked behind him. Incident Report, PageID#

---

[2] Law enforcement agents later learned the black Audi was registered to Rodriguez. Incident Report, PageID# 242.
[3] Defendant does not appear to concede that he was driving the Audi when the events at issue here took place. Because (1) the Court finds that the identity of the driver is inconsequential for the purposes of the current motion and (2) the police reports state Rodriguez was identified as the driver of the black Audi, Incident Report, PageID# 242, the Court will refer to Rodriguez as the driver here. However, this does not preclude Defendant from offering evidence that he was not the driver of the black Audi during future proceedings in this matter.

2

242. Bozios then "utilized a pick tool" to unlock the door so that he and the other officers could enter the building. Incident Report, PageID# 242. Once inside, the officers encountered another locked door. Incident Report, PageID# 242. One of the tenants in the building opened this door for them, which led to a common hallway. Incident Report, PageID# 242. The officers did not see Rodriguez in this hallway. Incident Report, PageID# 242.

The officers then left the building and secured the black Audi parked outside. Incident Report, PageID# 242. They requested weapons and narcotics canines to the scene to conduct an olfactory search of the vehicle. Incident Report, PageID# 242. While waiting for the police dogs to arrive, the officers reported that they smelled a "strong odor" of marijuana emanating from the vehicle. Incident Report, PageID# 242. They also received information from a confidential informant that Rodriguez lived at 425 N. 12th Street, Apt. #12 with his girlfriend. Incident Report, PageID# 242. Recall, the police had followed the black Audi to 475 N. 12th Street. Incident Report, PageID# 242. So, the address provided by the confidential informant was different than the address at which the police were present. Nevertheless, based on this information, the officers attempted to speak with the occupants of Apt. #12 at 475 N. 12 Street. Incident Report, PageID# 242. They were "met with no answer" after knocking on the door numerous times. Incident Report, PageID# 242.

Eventually, two canine units arrived at the scene. (ECF No. 60, Def. Br., Exhibit F, PageID# 282) [hereinafter "Dispatch Log"]. According to the report submitted by the canine officer, the first unit returned a negative result for weapons. (ECF No. 60, Def. Br., Exhibit G, PageID# 286) [hereinafter "Canine Officer Report"]. However, the second unit returned a positive result for narcotics. Canine Officer Report, PageID# 286. Consequentially, the officers

3

had the black Audi towed pending the issuance of a search warrant.  Incident Report, PageID# 242.

Days later, Detective Jimmy Rodriguez, one of the officers who was at the scene on July 2nd, submitted an affidavit of probable cause in support of a search warrant for the black Audi based on the above facts.[4]  (ECF No. 60, Def. Br., Exhibit E, PageID# 272–80) [hereinafter "Affidavit of Probable Cause"].  The search warrant issued, and the vehicle was searched on July 8th.  (ECF No. 60, Def. Br., Exhibit C, PageID# 248) [hereinafter "Incident Continuation Report"].  Defendant provided the police with his car keys prior to the search.  Incident Continuation Report, PageID# 248.  During the search, the officers found the following items in the trunk of the vehicle: (1) a 9mm handgun loaded with nine ball point rounds; (2) a .45 caliber handgun loaded with eight ball point rounds; (3) a 38 special revolver; (4) bags containing approximately sixteen grams of marijuana; and (5) a clear plastic bag containing approximately forty grams of cocaine.  Incident Continuation Report, PageID# 248–49.  They also found a wallet containing Rodriguez's license and other documents addressed to Rodriguez in the vehicle.  Incident Continuation Report, PageID# 248.

Rodriguez was arrested on July 10, 2020.  (ECF No. 3).  In December 2020 he was indicted on one count of unlawful possession of a firearm by a convicted felon.  (ECF No. 12).  A superseding indictment was filed in May 2021 charging him with two additional counts: possession with intent to distribute cocaine, and possession of firearms and ammunition in furtherance of a drug trafficking crime.  (ECF No. 31).

---

[4] As Defendant points out, the affidavit of probable cause is almost identical to the incident report cited extensively above.  (Def. Br. at 17).

4

Defendant has now filed an omnibus pretrial motion. He seeks the following relief: (1) a hearing under Franks v. Delaware, 438 U.S. 154 (1978), as to the validity of the warrant authorizing the search of his vehicle; (2) disclosure of the identities of the confidential informants used by the officers during their investigation; (3) disclosure of exculpatory evidence within the Government's control pursuant to Brady v. Maryland, 373 U.S. 83 (1963); (4) pretrial disclosure of written summaries of the Government's expert testimony and witness lists; (5) compelled preservation of the rough notes produced during the Government's investigation; (6) disclosure of impeaching information pursuant to Giglio v. United States, 405 U.S. 150 (1972); (7) early disclosure of Jencks Act materials; (8) early disclosure of Rule 404(b) evidence; and (9) permission to file additional motions. The Court addresses each request in turn.

## II.  DISCUSSION

### A. Defendant's Request for a Hearing Pursuant to Franks v. Delaware, 438 U.S. 154 (1978)

Defendant requests a hearing to determine the validity of the warrant authorizing the search of his vehicle. The Warrant Clause of the Fourth Amendment states: "no Warrants shall issue but upon probable cause, supported by Oath or Affirmation." U.S. Const. amend. IV. In Franks v. Delaware, 438 U.S. 154 (1978), the Supreme Court held that criminal defendants have the right to challenge the factual statements in an affidavit of probable cause supporting a warrant and provided a mechanism—the Franks hearing—for undertaking these challenges. Id. at 164–65, 171. However, the right to a Franks hearing is not absolute. United States v. Pavulak, 700 F.3d 651, 665 (3d Cir. 2012). Instead, the defendant must "(1) make a 'substantial preliminary showing' that the affiant knowingly or recklessly included a false statement in or omitted facts from the affidavit, and (2) demonstrate that the false statement or omitted facts are

5

'necessary to the finding of probable cause.'" Id. (quoting United States v. Yusuf, 461 F.3d 374, 383–84 (3d Cir. 2006)).

On the first prong of this inquiry, "omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would want to know" and "assertions are made with reckless disregard for the truth when an officer has obvious reason to doubt the truth of what he or she is asserting." Wilson v. Russo, 212 F.3d 781, 783 (3d Cir. 2000). The court may infer "that an affiant acted with reckless disregard for the truth where his affidavit contains an averment that was without sufficient basis at the time he drafted it." United States v. Brown, 631 F.3d 638, 649 (3d Cir. 2011). It is the defendant's burden to offer proof "contradicting the affidavit [of probable cause], including materials such as sworn affidavits or otherwise reliable statements from witnesses." Yusuf, 461 F.3d at 383 n.8. Conclusory allegations or a "mere desire to cross-examine" is not enough. Id. (quoting Franks, 438 U.S. at 171). Even so, as the second prong of the inquiry indicates, an affidavit that contains a misrepresentation or omission "may nevertheless support a valid warrant if information contained in the affidavit, independent of the defective portion, supports a probable cause finding." United States v. Conley, 4 F.3d 1200, 1208 n.7 (3d Cir. 1993).

Here, Rodriguez alleges there are numerous inconsistencies and falsehoods in the affidavit of probable cause supporting the search warrant for his vehicle. For Rodriguez, these inconsistencies and alleged falsehoods lead to the conclusion that Bozios did not observe a handgun transaction on the corner of Boyd and West Kinney Street. Because the Court concludes that none of the statements in the affidavit were made with reckless disregard for the truth, and, even if they were, the canine sniff that returned a positive result for narcotics would

6

still provide probable cause for the warrant, the Court will deny Rodriguez's motion for a Franks hearing.

     First, Rodriguez contends Bozios could not have observed the occupant of the black Audi retrieve a handgun from the white BMW because of Bozios' position relative to the two vehicles on West Kinney Street and the black Audi's tinted windows.[5] (Def. Br. at 19–21). This argument is meritless because Rodriguez does not identify any evidence to support his point. Instead, he simply speculates as to where Bozios could potentially have been positioned on West Kinney Street and then infers that Bozios could not have observed the transaction between the two vehicles from that position. Rodriguez's speculation is insufficient to carry his burden because defendants may not rely on "conclusory allegations" to make the preliminary showing required for a Franks hearing. See Yusuf, 461 F.3d at 383 n.8.

     Next, Rodriguez questions a number of decisions made by Bozios in the seconds after he allegedly witnessed the transaction involving the handgun. For one, Rodriguez argues that it was illogical for Bozios to follow the purchaser of the handgun (the occupant of the black Audi) rather than pursue the sellers (the occupants of the white BMW). (Def. Br. at 21–22). He also maintains that the officers' explanation that they were unable to pull over the black Audi immediately because there were no "police vehicles on [the] scene that were equipped with lights

---

[5] Rodriguez claims this point is bolstered by the fact that the police did not find a handgun in back seat of the black Audi. (Def. Br. at 32; Def. Reply Br. at 5–6). The Government correctly points out that Rodriguez could have taken the handgun into the apartment building with him when he left the vehicle. (Gov. Br. at 10). Rodriguez contends that if this was the case then the officers would have seen him reach into the back seat of the car to pick up the gun. (Def. Reply. Br. at 5–6). But this is also simply speculation—Rodriguez assumes, without identifying any evidence, that the officers would have observed this movement from afar as they were following the black Audi to the apartment building on 475 N. 12th Street. Finally, in his Reply Brief, Rodriguez further argues the officers would have been able to see that there was no handgun in the back seat as they secured the car outside of the apartment building. (Def. Reply Br. at 6). Even if the officers observed that there was no handgun in the back seat at this time, the affidavit still supplies probable cause because a canine sniff returned a positive result for narcotics shortly after the officers secured the vehicle, as discussed more fully below.

an[d] sirens" is unbelievable. (Def. Br. at 22). Finally, Rodriguez argues that the decision not to initiate a motor vehicle stop at any point during the fifteen-minute drive to 475 N. 12th Street was irrational. (Def. Br. 22–23). For Rodriguez, all of these decisions indicate that Bozios did not actually witness a handgun transaction on the corner of Boyd and West Kinney Street.

Rodriguez also critiques the officers' actions at the apartment building on 475 N. 12th Street.[6] He suggests Bozios never actually saw Rodriguez get out of the black Audi because the police reports do not provide a description of Rodriguez. (Def. Br. at 23). He also argues that, if Bozios had actually observed a handgun transaction only minutes earlier, the officers would have commanded Rodriguez to stop more urgently as he was entering the building. (Def. Br. at 24). Similarly, Rodriguez contends that the officers would have forcefully entered Apt. #12 after receiving the tip from the confidential informant if they did indeed believe Rodriguez lived there and was in possession of a handgun. (Def. Br. at 27–28). And lastly, he argues that there would have been no need to call the police canines to perform an olfactory search of the car for drugs and weapons if Bozios had actually observed a transaction involving a handgun on the corner of Boyd and West Kinney Street because that observation would have been sufficient to establish probable cause on its own.[7] (Def. Br. at 28–29).

---

[6] Among these criticisms, Rodriguez appears to suggest that Bozios' use of a lock pick tool to enter the first door to the apartment building violated his Fourth Amendment rights. (Def. Br. at 25–27). However, the affidavit of probable cause (and the police report) both indicate that this door led to a common hallway in the apartment building. Incident Report, PageID# 242; Affidavit of Probable Cause, PageID# 274. So, as the Government points out, Rodriguez does not have standing to challenge Bozios' use of the lock pick tool to enter the building. United States v. Correa, 653 F.3d 187, 190–91 (3d Cir. 2011) (holding that a resident of a multi-unit apartment building does not have an expectation of privacy in the common areas of the building even where the exterior door is locked).
[7] Rodriguez also argues that the lack of body camera footage capturing any of these events leads to the inference that this footage would be beneficial to his arguments. (Def. Br. at 32–33). For support, he cites a Newark Police Department Order requiring uniformed officers to wear and activate body cameras. (Def. Br. at 32–33). But, as the Government argues, none of the officers involved here were subject to that Order because all of them were members of the Essex County Sheriff's Office, not the Newark Police Department. (Gov. Br. at 10). As such, the Court declines to make an adverse inference against the Government based on the lack of body camera footage.

None of these allegations is sufficient to warrant a Franks hearing either. At bottom, Rodriguez is merely criticizing the tactics employed by the police during their investigation. See United States v. Swanson, 210 F.3d 788, 791 (7th Cir. 2000) (explaining that the defendant's allegation that "the investigators should have done more work" does not meet "the high standard for convening a Franks hearing"). His criticisms do not call into question the truth of the facts contained in the affidavit of probable cause. See United States v. Jones, 208 F.3d 603, 607 (7th Cir. 2000) ("The fact that [the defendant] can point out additional things which could have been done but were not does not in any way detract from what was done."). Rather they indicate that Rodriguez would like to question the officers about their decisions and investigate their credibility. That is not the proper purpose for a Franks hearing: the Court may not grant Defendant's request based solely upon his desire to cross-examine the officers. Yusuf, 461 F.3d at 383 n.8.

Moreover, and importantly, even if any of the facts discussed above were reported with reckless disregard for the truth, the affidavit still would have supported a finding of probable cause. United States v. Frost, 999 F.2d 737, 742–43 (3d Cir. 1993) ("[A] defendant must show both that bad faith or reckless disregard existed on the part of the affiant, and that there would have been no probable cause but for the incorrect statement." (emphasis in original)). That is because a police canine returned a positive result for narcotics when it sniffed the black Audi outside of the apartment building. Incident Report, PageID# 242; Affidavit of Probable Cause PageID# 275. On its own, the positive result is sufficient to establish probable cause to support the search warrant for the vehicle. United States v. Pierce, 622 F.3d 209, 213 (3d Cir. 2010) ("It is also well-established that, looking at the totality of the circumstances, a dog's positive alert

9

while sniffing the exterior of the car provides an officer with the probable cause necessary to search the car. . . ."); United States v. Johnson, 434 F. App'x 159, 163 (3d Cir. 2011) (explaining that officers had probable cause to impound a car and search it pursuant to a warrant after a "canine sniff yielded a positive hit"). As such, Rodriguez's arguments also fail on the second prong of the Franks hearing inquiry.

      Finally, Rodriguez attacks the credibility of the canine sniff. First, he describes the sniff as "tremendously suspect" because it took the canine almost an hour to return a positive result for narcotics. (Def. Br. at 31–32). However, his argument does not hold weight as a mater of fact. The dispatch log from July 2nd indicates that the two canine units arrived on the scene at 2:30 PM and then a positive result for narcotics was returned at 2:48 PM. Dispatch Log, PageID# 282. So, contrary to Rodriguez's assertion, the positive result occurred within eighteen minutes after the arrival of the canine units. In his Reply Brief, Rodriguez contends "it is. . . difficult to see how to trust a canine sniff result that took eighteen whole minutes to issue." (Def. Reply Br. at 8). But he provides no legal support for this statement. And he ignores the fact that the canine sniff presumably did not start as soon as the canines arrived on the scene. Indeed, the canine officer's report indicates that he spoke to Bozios before starting the search. Canine Officer Report, PageID# 286.

      Rodriguez also argues in his Reply Brief that the dispatch log and the canine officer's report are inconsistent with each other. According to Rodriguez, the dispatch log indicates the first canine unit returned a positive result for narcotics at 2:48 PM while the second canine unit returned a positive result for narcotics and a negative result for weapons at 2:55 PM. (Def. Reply Br. at 7–8). This sequence of events contradicts the canine officer's report, which states

10

that the first canine unit returned a negative result for weapons and then the second returned a positive result for narcotics. (Def. Reply Br. at 7–8).

Once again, Rodriguez's argument is simply speculation without any evidence. The 2:48 PM entry in the dispatch log is titled a "Call for Tow" and states "positive for narcotics." Dispatch Log, PageID# 282. The 2:55 PM entry is described as a "Narrative" and states "positive narcotics, negative on weapons." Dispatch Log, PageID# 282. Contrary to Rodriguez's assertion, the dispatch log does not indicate that these two entries refer to two different sniffs returned by two different canine units. Indeed, the "Call for Tow" description of the first entry could indicate that it notes when and why the tow truck was called while the "Narrative" description of the second entry could mean that it simply expands on the first entry by mentioning the negative weapons result returned by the first canine unit as well. Thus, it is entirely possible that the two entries in the dispatch log are reporting the same positive result returned by the second canine unit, as described in the canine officer's report. Canine Officer Report, PageID# 286. And, even if, as Rodriguez argues, the dispatch log did indicate that both canine units returned a positive result for narcotics, that would only bolster the finding of probable cause to support the search of the vehicle. As such, the Court finds that this alleged contradiction between the dispatch log and the canine officer's report is insufficient to warrant a Franks hearing.

For those reasons, the Court will deny Rodriguez's request for a Franks hearing.

**B. Defendant's Request for Disclosure of the Identities of the Government's Confidential Informants**

Rodriguez argues that the police reports "strongly suggest" that, rather than Bozios' firsthand observations, a confidential informant provided the police with information about the

11

alleged transaction on the corner of Boyd and West Kinney Street.  (Def. Br. at 34–36).  He asks the Court to order the Government to identify this confidential informant.  (Def. Br. at 36).  As described more fully above, Rodriguez has not produced any evidence that would support his speculation that Bozios did not observe what is reported in the police reports.  Therefore, he has provided no basis to believe that the police used a confidential informant to learn about the transaction on Boyd and West Kinney.  Thus, the Court will deny his request for disclosure of the alleged informant.

Moreover, to the extent Rodriguez asks the Court to order the Government to identify the confidential informant who told the police that he lived at 425 N. 12th Street, the Court finds that the identity of this informant is not "essential to a fair determination of a cause."  Roviaro v. United States, 353 U.S. 53, 60–61 (1957).  As such, the Court will also deny that request.

### C. Defendant's Request for Disclosure of Brady Material

Rodriguez also seeks production of evidence and materials as required under Brady v. Maryland, 373 U.S. 83 (1963). (Def. Br. at 37).  The Government has recognized its obligation to provide Brady material and affirmed that it has complied with this obligation thus far. (Gov. Br. at 12–13).  The Government also indicates that it will continue to comply with Brady should any new exculpatory material comes into its possession. (Gov. Br. at 12–13).  The Court finds the Government's response adequately addresses the Defendants' request for Brady disclosures.

### D. Defendant's Request for Pretrial Disclosure of Written Summaries of Expert Testimony the Government Intends to Offer at Trial and Witness Lists

Rodriguez requests a written summary of expert testimony the Government intends to use in its case-in-chief and the identities of witnesses the Government intends to use at trial.  (Def. Br. at 37–38).  The Government states it will make these disclosures in accordance with the trial

12

schedule set by the Court. (Gov. Br. at 13). Trial in this matter is set to begin on May 3, 2022. (ECF No. 65). The Court finds that disclosure of these materials one week prior to this date is appropriate.

### E. Defendant's Request for Compelled Preservation of Rough Notes Taken During the Investigation

Rodriguez also requests the Court order the Government to preserve all rough notes, interview notes, surveillance notes, draft reports, and final reports produced by law enforcement agents during the investigation that led to his arrest. (Def. Br. at 39–41). The Government responds that it is aware of its obligation to preserve these materials pursuant to United States v. Ammar, 714 F.2d 238, 259 (3d Cir. 1983). (Gov. Br. at 13–14). The Court finds the Government's response adequately addresses Defendant's request for preservation of rough notes.

### F. Defendant's Request for Disclosure of Giglio Materials

Rodriguez next requests the Government disclose a host of impeachment material required under Giglio v. United States, 405 U.S. 150 (1972). (Def. Br. at 41–56). The Government has correctly pointed out that it need not provide Giglio materials prior to trial. (Gov. Br. at 14). Nevertheless, the Government states that it will provide all Giglio materials to Defendant at least one week before trial. (Gov. Br. at 14–15). The Court finds the Government's response adequately addresses Rodriguez's request.

### G. Defendant's Request for Jencks Act Materials

Pursuant to the Jencks Act, Defendant seeks prior statements, reports, and notes produced by the Government's witnesses, and further asks that the Government produce such Jencks Act material prior to trial. (Def. Br. at 57–58). As with Giglio material, the Government is not

13

required to provide a witness's prior statements before trial. 18 U.S.C. § 3500. Nor does this Court have the authority to compel the production of Jencks Act material prior to the completion of direct examination. United States v. Murphy, 569 F.2d 771, 773 (3d Cir. 1978). However, the Government has indicated that it will also provide Defendant with Jencks Act material at least one week prior to trial. (Gov. Br. at 14–15). The Court finds the Government's response adequately addresses Rodriguez's request.

In turn, the Government requests the Court order Rodriguez to disclose so-called "reverse Jencks" material a week before trial as well. (Gov. Br. at 15). Because there is no obligation that defendants provide prior statements of their witnesses before a witness's testimony, this request by the Government is denied.

### H. Defendant's Request for Disclosure of Rule 404(b) Evidence

Rodriguez seeks disclosure of any Rule 404(b) evidence the Government intends to offer at trial and requests an evidentiary hearing regarding the admissibility of that evidence. (Def. Br. at 58–61). The Government recognizes its obligation to provide pretrial disclosure of any Rule 404(b) evidence it intends to offer at trial and indicates that it will comply with any pretrial scheduling order issued by this Court. (Gov. Br. at 15). As such, the Court orders the Government to make its Rule 404(b) disclosures one week prior to the trial start date in this matter. At that time, Defendant may renew his motion for an evidentiary hearing.

### I. Defendant's Request for Permission to File Additional Motions

Finally, Rodriguez reserves the right to file additional motions based on discovery of which he is not yet in possession. (Def. Br. at 61). The Government does not oppose this request and also reserves its own right to file additional motions with the same limitations. (Gov.

Br. at 15–16).  The Court orders that both parties have the right to file additional motions based on discovery material and other information that was not previously available to them.

### III.    ORDER

As set forth above, the dispositions of Defendant's various motions contained in his omnibus application, (ECF No. 60), are **SO ORDERED**; and it is further

**ORDERED** that Defendant's omnibus pretrial motion, (ECF No. 60), is **TERMINATED**.

   s/ Stanley R. Chesler   <br>
STANLEY R. CHESLER<br>
United States District Judge

Dated: April 8, 2022

15